**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| **KATHRYN D. GIFFIN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 2:20-CV-00069 PLC** |
| ) | |
| **KILOLO KIJAKAZI,** [1] ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM AND ORDER**

Plaintiff Kathryn Giffin seeks review of the decision of Defendant Acting Social Security

Commissioner Kilolo Kijakazi denying her applications for Disability Insurance Benefits (DIB)

and Supplemental Security Income (SSI) under the Social Security Act.  For the reasons set forth

below, the Court reverses and remands the Commissioner's decision.

**I.      Background**

In April and May 2018, Plaintiff, who was born in April 1985, filed applications for DIB

and SSI alleging she was disabled as of December 26, 2014 as a result of:  "herniated disc L4, L5

with sciatica and arthritis in left leg and back, carpal tunnel in right arm and hand, bipolar 1

disorder, borderline personality disorder, anxiety, depression, ADD, PTSD, hepatitis C, and

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant
to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted,
therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue
this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §
405(g).

polycystic ovarian syndrome." [2]  (Tr. 136, 267-268, 269-81).  The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ).  (Tr. 173-74, 197-98)

An ALJ conducted a hearing in September 2019.  (Tr. 30-84)  In a decision dated December 11, 2019, the ALJ determined that Plaintiff "has not been under a disability, as defined in the Social Security Act, from December 26, 2014, through the date of this decision."  (Tr. 10-22)  Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 1-6, 262-64)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.      Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff testified that she was thirty-four years old and lived with her nine-year-old daughter.  (Tr. 35)  Plaintiff attended two years of college and, in 2011, obtained a degree in "[d]ental assisting."  (Tr. 35-36)  Plaintiff previously worked as a dental assistant, waitress, and restaurant hostess and in customer service at a Menards store.  (Tr. 71-73)

Plaintiff testified that she injured her back in a car accident as a teenager and reinjured it lifting a cement bucket at Menards in 2014.  (Tr. 36)  Plaintiff experienced back pain "[e]very day, all the time."  (Tr. 49)  The pain radiated from her lower back to her neck, and its severity changed with the weather and physical activity.  (Tr. 49-50)  Plaintiff's pain radiated to her legs and feet, like "electric shocks, lightning bolts."  (Tr. 50-51)

---

[2] The Social Security Administration denied a previous application for DIB that Plaintiff submitted in December 2014.  (Tr. 121)

Plaintiff stated that she had "been recommended for" back surgery "several times," but was "scared to do it."  (Tr. 36)  Plaintiff had not received injections for "several years" because "they seem to help for around three months and then it gets worse."  (Tr. 44)  Although her doctor prescribed a cane, she did not pick it up.  (Tr. 38)  Plaintiff took gabapentin and ibuprofen for pain, explaining, "I choose not to take my narcotics anymore which I was on pretty heavy … they prescribed Fentanyl [patches] and Percocet for my back."  (Tr. 65-66)

Plaintiff testified that she had sciatica and her "legs hurt all the time and my knees hurt all the time."  (Tr. 50-51)  To reduce the swelling in her legs and feet, Plaintiff elevated them "every night" and "sometimes" during the day.  (Tr. 53)

Plaintiff suffered carpal tunnel syndrome in both wrists.  (Tr. 67)  She planned to undergo surgery but had not yet scheduled it "because it's expensive."  (Tr. 67)  Plaintiff also experienced urinary incontinence, which she attributed to "pinched nerves."  (Tr. 52)  She explained, "it happens every day small times … but where I have to change my clothes, maybe twice a week even."  (Id.)

In regard to her mental health, Plaintiff affirmed that she had bipolar disorder with manic and depressive episodes, and added, "… I have borderline personality disorder so it's severe and it's every day, both, up and down…. I've been told unbearable [sic] by my parents, that they can't handle me.  I don't notice it." (Tr. 54)  Plaintiff explained that, during depressive periods, "I don't leave the house.  I don't shower.  I don't barely get up to go to the bathroom."  (Tr. 55)  She estimated that her depressive episodes last for "maybe a month at a time" and occurred three or four times per year.  (Tr. 55)  Plaintiff experienced crying spells "at least once a week" and flashbacks, during which she relived past trauma, including physical and sexual abuse.  (Tr. 56)

3

"[C]ertain smells, just words, voices, certain tones of voice, yelling" triggered Plaintiff's flashbacks.  (Tr. 57)

Plaintiff testified that she experienced mood swings, "anger outbursts," and "audible hallucinations," explaining, "I hear crowds and radio…like talk shows…. I also am very paranoid and I thought, think … that people are playing songs … about what's in my head…."  (Tr. 60-61) Plaintiff also felt "that everyone doesn't like me and that they're talking about me all the time." (Tr. 61)  She experienced nightmares four or five nights per week and occasional night terrors, after which "I'm usually in bed the whole day and I don't go anywhere."  (Tr. 59)  At the time of the hearing, Plaintiff's medications included tizanidine, clonazepam, clonidine, paliperidone,[3] amlodipine, ProAir, Flonase, furosemide, oxybutynin, meloxicam, and gabapentin.

Plaintiff testified that she could lift "[n]o more than a gallon of milk" using both hands and was able to stand or walk seven minutes before needing to sit.  (Tr. 43, 45)  Plaintiff estimated she could sit comfortably for ten minutes.  (Tr. 44)

In regard to daily activities, Plaintiff testified that "[a]nything up high like my hair, stuff like that is really hard to do. It's easy for me to bend.  It's harder for me to do things up high …." (Tr. 39)  Plaintiff's daughter helped her wash her hair, and also swept, mopped, and vacuumed the floors and cleaned the bathtub.  (Tr. 40)  Plaintiff washed "the dishes sometimes but I lean on the table and take a lot of breaks."  (Tr. 40)  On a typical day, Plaintiff's daughter or neighbor "helps me get ready" for appointments and group therapy, which she "tr[ied]" to attend for two hours per day four days per week.  (Tr. 40)  Plaintiff often left group therapy and her weekly NA meetings early due to physical discomfort.  (Tr. 46-47)

---

[3] Plaintiff stated, "I'm coming off [paliperidone] for the next six days and changing to a new medication…. I believe it's called Viibryd.  It's for medication[-]resistant major depressive disorder."  (Tr. 64)

Plaintiff was not able to grocery shop by herself because "[i]t's way too much for me …
just even a gallon of milk is like hard for me to get, pick up … and the people, there so many
people there."  (Tr. 41)  Plaintiff attended one fifteen-minute event at her daughter's school in the
past year.  (Tr. 42, 46)  She was able to drive, but she needed to stop every twenty to thirty minutes
due to back and neck pain.  (Tr. 48)  Although she enjoyed drawing and writing, Plaintiff's carpal
tunnel syndrome precluded these activities.  (Tr. 68)   She used her cellphone's microphone to
send text messages.  (Tr. 70)

A vocational expert also testified at the hearing.  (Tr. 74-82)  The ALJ asked the vocational
expert to consider a hypothetical individual with Plaintiff's age, education, and work experience
able to perform light work with the following limitations:

> that person could lift 20 pounds on occasion and 10 pounds frequently and could
> stand and/or walk about six out of eight hours and could sit at least six hours all
> with normal breaks and that the person should avoid climbing ladders, ropes and
> scaffolds and working at unprotected dangerous heights around unprotected
> dangerous machinery and a person could occasionally stoop, kneel, crouch and
> crawl and a person … would be limited to pushing and pulling to frequently and
> also … the use of the bilateral upper extremities for fine and gross manipulation
> would be limited to frequently rather than constantly…. Also that the person
> should avoid jobs that would expose him to whole body vibration such as
> operating heavy equipment either off road or on road and a person should avoid
> … concentrated exposure to extreme cold.  The person would be limited to
> simple and/or repetitive work that didn't require close interaction with the public
> in the sense of no retail sales or customer service type jobs and minimal
> incidental contact with the public would be acceptable and also no close
> interaction with coworkers in the sense of no job that would require coworkers
> to get together to determine work duties, work processes, work locations, no
> team work type jobs, solitary type employment.

(Tr. 78-79)  The vocational expert affirmed that there would be no past relevant work, but the
hypothetical individual could perform the jobs of sorter, plastic mold tender, and press operator.
(Tr. 79)

5

When the ALJ reduced the exertional level to sedentary, "which would be a maximum lift of 10 pound and a maximum stand and/or walk of about two out of eight hours," the vocational expert stated that the hypothetical individual would be able to perform the jobs of laminator, sealer, and semiconductor bonder.  (Id.)  However, if the hypothetical individual missed more than two days of work per month, arrived late or left early "at least once every week," or was off task more than ten percent of the day, he or she would not be able to maintain competitive employment.  (Tr. 80)

In regard to Plaintiff's medical records, the Court adopts the facts Plaintiff sets forth in the Statement of Uncontroverted Facts, to the extent they are admitted by the Commissioner.  [ECF Nos. 23-1, 26-1]  Additional specific facts will be discussed as necessary to address the parties' arguments.

### III.      Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. §§ 404.1505(a), 416.905(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520(a), 416.920(a).  Those steps require a claimant to

first show that he or she is not engaged in substantial gainful activity.  Id.  Second, the claimant must establish that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.152(c), 416.920(c).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted).  At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1.  Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011).  If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step.  Id.

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.   20 C.F.R §§ 404.1520(g), 416.920(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).  If the claimant cannot make

an adjustment to other work, then she will be found to be disabled.  20 C.F.R. §§ 404.1520(g), 416.920(g).

### IV.    ALJ's Decision

In his decision, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920. (Tr. 10-22)  The ALJ determined that Plaintiff:  (1) had not engaged in substantial gainful activity since December 26, 2014, the alleged onset date; and (2) had the severe impairments of bipolar disorder, PTSD, ADHD, degenerative joint disease of the lumbar spine, and carpal tunnel syndrome.  (Tr. 13)  Additionally, the ALJ found that Plaintiff had the non-severe impairments of urinary problems, foot swelling, bilateral knee degeneration, and constipation.  (Id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)

Based on his review of Plaintiff's testimony and medical records, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 17)  The ALJ determined that Plaintiff had the RFC to perform light work[4] except:

> the claimant should avoid climbing ladders, ropes, or scaffolds, as well as working at unprotected heights and around unprotected dangerous machinery.

---

[4] As defined by the regulations,

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls….

20 C.F.R. §§ 404.1567(b), 416.967(b).

> She is limited to occasional stoop, kneel, crouch, and crawl.  She is limited to pushing frequently, as well as frequent use of the bilateral upper extremities for fine and gross manipulation.  She should avoid exposure to whole body vibration and concentrated exposure to extreme cold.  She can perform simple, routine work.  She cannot tolerate interaction with the public or co-workers.

(Tr. 15)

Based on the vocational expert's testimony, the ALJ concluded that Plaintiff was unable to perform her past relevant work but had the RFC to perform other jobs that existed in significant numbers in the national economy.  (Tr. 19-20)  The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 21)

**V.     Discussion**

Plaintiff claims the ALJ erred in finding she was not disabled because:  (1) he did not properly consider the opinion of Plaintiff's treating provider; and (2) the RFC is not supported by substantial evidence.  [ECF No. 23] The Commissioner counters that the ALJ properly considered the entire record and incorporated into his RFC finding those restrictions he found consistent with the evidence.  [ECF No. 26]

**A.  Standard of Judicial Review**

A court must affirm an ALJ's decision if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's determination, [but it] may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome."  Id.  (quoting Posch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

**B.  Medical Opinion Evidence**

Plaintiff argues the ALJ erred in formulating her RFC because he did not properly consider the opinion of her primary care provider, Nurse Practitioner (NP) Katumu, when assessing her physical limitations.  In response, the Commissioner asserts that the ALJ properly evaluated NP Katumu's opinion and found it unpersuasive.

Because Plaintiff filed her application after March 27, 2017, the Court applies 20 C.F.R. §§ 404.1520c, 416.920c.  Under these new regulations, an ALJ is no longer required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the ALJ must evaluate the persuasiveness of such opinions by considering five factors:  supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict the opinion.  20 C.F.R. §§

10

404.1520c(c), 416.920c(c).  Supportability[5] and consistency[6] are the most important factors when assessing the persuasiveness of a medical opinion.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  Therefore, an ALJ must "explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions … in [his or her] determination or decision."  Id.

NP Katumu completed a checklist Medical Source Statement-Physical (MSS) for Plaintiff in September 2019.  (Tr. 1534-37)  In the MSS, NP Katumu opined that Plaintiff could: occasionally[7] lift and carry less than ten pounds; stand and walk less than two hours during an eight-hour workday; sit for less than two hours; occasionally stoop, crouch, and climb stairs; and never twist or climb ladders.  (Id.)  He estimated that Plaintiff was able to sit for fifteen minutes and stand for ten minutes before needing to change position and that she would need to walk around every twenty to thirty minutes and lie down two to three times per day.  (Tr. 1534)  NP Katumu attributed these physical limitations to "cervicalgia, lumbago, right hip pain, bilateral knee pain."  (Id.)

In regard to manipulative functions, NP Katumu stated that Plaintiff was able to occasionally reach and handle but never finger, feel, or push/pull with her upper or lower

---

[5] In regard to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medial source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  "In other words, an opinion is more persuasive if it presents more relevant objective medical evidence and explanatory rationale in support of the opinion."  Morton v. Saul, No. 2:19-CV-92 RLW, 2021 WL 307552, at *7 (E.D. Mo. Jan. 29, 2021).

[6] As to the consistency factor, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). "Stated more simply, an opinion is more persuasive if it is more consistent with the overall evidence as [a] whole." Morton, 2021 WL 307552, at *7.

[7] The MSS form defined "occasional" as "no more than 1/3 of an 8-hour day." (Tr. 1534)

11

extremities.  (Tr. 1535)  In support of those limitations, NP Katumu identified the following findings:  carpal tunnel syndrome, cervicalgia, lumbago, right hip pain, and bilateral knee pain. (Id.)  Finally, NP Katumu opined that Plaintiff would be off task more than twenty-five percent of the workday and would need to take five- to ten-minute breaks every fifteen to twenty minutes. (Tr. 1537)

The ALJ reviewed NP Katumu's MSS and determined it was "not persuasive."  (Tr. 18) The ALJ discredited the manipulative limitations identified by NP Katumu, in particular his opinion that Plaintiff can never "finger, feel, push/pull with upper and lower extremities, as well as never twist…."  (Id.) (emphasis in original)  The ALJ explained that NP Katumu attributed the manipulative limitations to carpal tunnel syndrome, but "those objective findings only support right sided impact, with mild to moderate symptoms."  (Id.)

In regard to the exertional and postural limitations identified in the MSS, the ALJ explained they are "based on cervicalgia (neck pain), lumbago (back pain), right hip pain and bilateral knee pain, with no explanation of any objective factors but rather the claimant's subjective complaints." (Tr. 18)  The ALJ further reasoned:  "[O]ne of the issues with [NP Katumu's] opinion is that the objective evidence does not support such limitations, with only mild findings, and no stenosis noted in medical imagery, and no neck degeneration noted."  (Id.)

Plaintiff argues that the record as a whole supports NP Katumu's opinion.  More specifically, she claims that substantial evidence did not support the ALJ's decision to discredit NP Katumu's opinion for inconsistency.[8]  Plaintiff asserts that her medical records evidence

---

[8] Although Plaintiff does not raise the issue of supportability, the Court notes that the ALJ did not address the supportability of NP Katumu's decision.  When determining the persuasiveness of a medical source's opinions under the new regulations, an ALJ must explain in his decision how he considered the factors of supportability and consistency. 20 C.F.R. § 404.1520c(b)(2); see Lucus v. Saul, 960 F.3d 1066, 1069-70 (8th Cir. 2020) (remanding where ALJ discredited physician's

12

significant chronic back pain and worsening degenerative disc disease consistent with NP Katumu's MSS.

An MRI of Plaintiff's lumbar spine performed in October 2014 revealed "a midline disc bulge/protrusion with what may be an annular fissure at the L4-L5 level," "loss of signal at the L4-L5 disc and on the T2 weighted images indicative of dehydration[,]" and "some bright signal in the L4-L5 facet joint, right side more than left indicative of some acute facet arthritis[,]" and "radiographs showed some narrowing of the L5-S1 disc space." (Tr. 616) After one month of physical therapy, Plaintiff experienced "modest improvement" in leg pain and "minimal improvement" in back pain. (Tr. 632)

In January 2015, Plaintiff began treatment for lower back pain radiating down left leg to knee with a pain specialist in Quincy, Illinois. (Tr. 593) The pain specialist prescribed hydrocodone and administered a steroid injection. (Id.) Plaintiff's primary care provider increased her Norco prescription the following month, and refilled the prescription after appointments in March and May 2015. (Tr. 636, 642, 674)

Sometimes after May 11, 2015[9], Plaintiff moved from Quincy to St. Louis, where she established care for chronic back pain with Dr. Leahy. (Tr. 732-35) Dr. Leahy treated Plaintiff in August, September, and October 2015, prescribing Norco. (Tr. 726-35) In December 2015, Plaintiff presented to SIU Center for Family Medicine in Quincy, where a physician's assistant

---

opinion without discussing factors contemplated in regulation, as failure to comply with opinion-evaluation regulation was legal error); Bonnett v. Kijakazi, 859 Fed. Appx. 19, 2021 WL 4258770, at *1 (8th Cir. Sept. 20, 2021) (unpublished per curiam) (reversing for legal error under the new regulations and remanding for further consideration of treating physician's opinion where the ALJ adequately addressed the opinion's supportability but did not address whether it was consistent with other evidence of record).

[9] In early July 2015, she presented to the emergency room at Mercy Hospital with suicidal ideation and reported "being out of pain pills and started using heroin." (Tr. 687) Plaintiff was discharged three days later with prescriptions for gabapentin and Thorazine. (Tr. 719)

(PA) noted that Plaintiff's "sx and treatment history seem out of proportion to the MRI results from 10/14." (Tr. 795)

In January 2016, Plaintiff saw a pain specialist at SIU Center for treatment of her lower back pain and left leg weakness. (Tr. 792)  On examination, the doctor noted sciatic notch tenderness on the left, bilateral paraspinal muscle spasm, full ROM, and positive straight-leg raising at 30 degrees on the left. (Tr. 793-94)  The doctor adjusted Plaintiff's Norco prescription. (Tr. 792)  The following month, a pain specialist at SIU Center discussed with Plaintiff an "exit plan for the Norco," "continued her current dose for now," and prescribed venlafaxine. (Tr. 785)  An MRI in March 2016 revealed:  "L4-L5 disc space narrowing with central protrusion.  No significant stenosis." (Tr. 773)

Based on the record, it appears that Plaintiff did not receive treatment for chronic back pain from January 2016 until August 2016, when she presented to an emergency room in St. Louis with suicidal ideation. (Tr. 965)  During her six-day psychiatric hospitalization, Plaintiff reported that she "has been to pain management, but now has not been to see any doctors for months.  Acute on chronic left leg sciatica…. She reports pain as a reason she wants to commit suicide."[10] (Tr. 984)

Plaintiff established care for back and right-hand pain with a primary care physician at Clarity Healthcare in Hannibal, Missouri in late-March 2018. (Tr. 1292)  Plaintiff reported that her back pain was constant and rated it seven out of ten. (Id.)  The nurse practitioner prescribed clonazepam, suboxone, Trileptal, and Wellbutrin. (Tr. 1296)  On examination in April 2018, a

---

[10] There is a gap in Plaintiff's treatment for physical, as well as mental, impairments between August 2016 and March 2018.  During this time period, Plaintiff experienced homelessness and underwent psychiatric hospitalizations in St. Louis in June 2017 and February 2018. (Tr. 808-913, 921-62).  Plaintiff entered residential treatment in Hannibal, Missouri in March 2018 and was discharged in November 2018. (Tr. 1406, 1417)

nurse practitioner noted tenderness of the lumbar spine and normal range of motion with moderate pain.  (Tr. 1270)

In May 2018, Plaintiff presented to Clarity Healthcare for treatment of "flare-ups" of lower back pain that had "caused her right knee to start aching."  (Tr. 1250)  The nurse practitioner continued Plaintiff's medications, increased her gabapentin, and prescribed baclofen.  (Tr. 1253) Plaintiff returned later that month, complaining of bilateral knee pain and lower back pain radiating "down her left leg mainly, but … radiating down her right leg within the past couple of weeks." (Tr. 1237)  On examination, the nurse practitioner noted:  "Tenderness: spinous, paraspinous, lumbar," "Buttock – Right Painful.  Left  Painful," "active painful range of motion," "Maximum tenderness – Left: lateral joint line," and "active painful range of motion" in the left knee.  (Tr. 1241-42)  The nurse practitioner continued Plaintiff's gabapentin and baclofen.  (Id.)

At Plaintiff's follow-up appointment at Clarity Healthcare in early-June 2018, she reported continued "lower back pain, and that nothing that she has tried has helped."  (Tr. 1230)  When Plaintiff returned two weeks later, she reported "progressively worsening pain in her lower back" with "radiation of pain down both of her legs."  (Tr. 1369)  The nurse practitioner prescribed Cymbalta and ordered an MRI.  (Tr. 1373)  The following month, x-rays revealed "[s]acralization of L5 with degenerative disc disease L5-S1," and an MRI showed "disc pathology at L4-L5 and L5-S1" "mild facet joint arthropathy from L4-S1."  (Tr. 1463, 1469)

At the consultative examination with Dr. Tentori in October 2018, Dr. Tentori observed, in regard to Plaintiff's lower extremities:

> Evaluation of lower extremities reveal bilateral knee tenderness to palpation in the left greater than right.  She is able to fully deep knee bend with noted discomfort.  There is no effusion of either knee.  Reflexes are equal in bilateral lower extremities and brisk.  There are no neuromuscular deficits.  There is no atrophy noted ….

15

(Tr. 1392)  On examination of Plaintiff's back, he noted:

> [F]lattening of the lumbar spine.  She is unwilling to extend at the lower back.
> She is tender in the area of L4, L5, and S1, especially on the left.  She has full
> range of motion of the hip flexion, again limited in full extension.  Bilateral
> hamstrings are tight.  Straight leg raises are positive in the supine position on the
> left, negative in the seated position.

(Id.)

In December 2018, Plaintiff presented to the emergency room with "worsening,"
"constant," and "spasmodic" low back pain, which she rated an eight out of ten.  (Tr. 1440)
Plaintiff was diagnosed with acute bilateral flank pain, acute aggravation of chronic low back pain,
and bilateral lumbar radiculopathy.  (Tr. 1445)

In January 2019, on referral from NP Katumu, Plaintiff saw a nurse specialist at the
Missouri Orthopaedic Institute for treatment of low back and leg pain and intermittent urinary
incontinence.  (Tr. 1518)  On examination, the nurse specialist noted tenderness to palpation in her
left paraspinous muscles between L5 and S1, normal motor strength and sensation in the lower
extremities, and negative straight-leg raise on the left and right.  (Tr. 1519)  The nurse specialist
ordered x-rays, which were "significant for a disc bulge with small annual tear at L4-5" with "mild
bilateral recess stenosis and ligamentum flavum hypertrophy at that level," and "another
significant disc protrusion [at L5-S1] that results in mild to moderate central stenosis but no
significant lateral recess or neuroforaminal stenosis."  (Tr. 1519-20)  An MRI showed "decreased
disc height at L4-5 and L5-S1 and facet arthropathy from L4-S1."  (Id.)  The nurse specialist opined
that Plaintiff's condition "would not be amenable to surgical intervention," administered a nerve
root injection, prescribed a cane, and recommended Plaintiff follow up with her primary care
physician to rule out fibromyalgia.  (Tr. 1520)

In May 2019, Plaintiff presented to NP Katumu at Clarity Healthcare with "persistent multi joint pain especially of the lower back and left knee[.]"  (Tr. 1486)  NP Katumu refilled Plaintiff's gabapentin.  (Tr. 1486)  Later that month, following Plaintiff's annual psychological evaluation, NP Katumu opined that Plaintiff "needs daycare services 4 days x week, 4 hours each" with "[d]uration of care …up to patient's progress."  (Tr. 1402)  Plaintiff's medications at that time included Invega, Wellbutrin, clonidine, Klonopin, metformin, suboxone, and gabapentin.  (Tr. 1493)

Despite the physical examinations and medical imaging demonstrating worsening degenerative disc disease, the ALJ stated that the objective evidence contained "only mild findings, and no stenosis noted in the medical imagery,"[11]  To the contrary, the MRI of January 2019 demonstrated stenosis, as well as disc protrusions at L4-L5 and L5-S1, decreased disc height at L4-L5 and L5-S1, and facet arthropathy from L4-S1.  Upon review, the Court finds that substantial evidence did not support the ALJ's assessment that NP Katumu's opinion as to Plaintiff's functional limitations was inconsistent with the objective evidence.

In light of the vocational expert's testimony relating to the number and frequency of absences, breaks, and positional changes generally tolerated by employers, the ALJ's decision to discredit NP Katumu's opinion (the only treating provider's opinion in the record relating to Plaintiff's physical functioning) was not harmless error.  NP Katumu opined that, as a result of Plaintiff's physical impairments, she could sit no longer than fifteen minutes and stand no longer than ten minutes before needing to change positions and would need to walk around every twenty to thirty minutes.  Additionally, NP Katumu estimated that Plaintiff would miss more than four

---

[11] The ALJ was correct, however, in finding that Plaintiff's medical records did not evidence cervicalgia, as NP Katumu opined.

days of work per month and be off task twenty-five percent of the workday.  According to the vocational expert's testimony, any one of these limitations would preclude competitive employment.  It therefore appears that, if ALJ had given more weight to NP Katumu's opinion, he would not have concluded that Plaintiff was not disabled.  See, e.g., Hahn v. Kijakazi, No. 1:21-CV-17 SPM, 2022 WL 4534420, at *6 (E.D. Mo. Sep. 28, 2022); Payne v. Kijakazi, No. 4:21-CV-1048 ACL, 2022 WL 4534436, at * (E.D. Mo. Sep. 28, 2022).

### C.  Subjective Complaints and RFC

Plaintiff argues generally that substantial evidence does not support the ALJ's RFC determination.  In support, Plaintiff appears to challenge the ALJ's determination that her subjective complaints were inconsistent with the medical evidence.   In response, the Commissioner asserts that the ALJ properly found that the medical records were inconsistent with disabling physical or mental limitations.

An ALJ must evaluate the credibility of a claimant's subjective complaints before determining his or her RFC.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007).  The Eighth Circuit requires that an ALJ consider the following factors when assessing a claimant's subjective complaints:  1) the claimant's daily activities; 2) the duration, intensity, and frequency of the pain; 3) precipitating and aggravating factors; 4) the dosage, effectiveness, and side effects of medication; 5) any functional restrictions; 6) the claimant's work history; and 7) the absence of objective medical evidence to support the claimant's complaints.  Finch v. Astrue, 547 F.3d 933 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony.  Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012).  "If an ALJ explicitly discredits the claimant's testimony and

gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). However, while "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, [and] not the courts, … such assessments must be based upon substantial evidence." Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004). Additionally, where an ALJ's credibility analysis is based in part on erroneous inferences from the record, a court should reverse "if the record does not weigh so heavily against the claimant's credibility that the ALJ would have necessarily disbelieved the claimant absent the errors drawn from the record." Chaney v. Colvin, 812 F.3d 672, 677 (8th Cir. 2016) (citing Ford v. Astrue, 518 F.3d 979, 983 (8th Cir. 2008)).

Here, after finding at step three of the sequential evaluation that Plaintiff's impairments did not meet the criteria for listing-level disability, the ALJ summarized the record and pointed to inconsistencies that detracted from Plaintiff's claims of disabling mental and physical symptoms. In regard to Plaintiff's mental impairments, the ALJ acknowledged that "[t]he established pattern during the period of adjudication is that the claimant, when not taking her medications, decompensates over time, uses drugs and alcohol, further decompensates and ends up in an inpatient admission." (Tr. 18-19) The ALJ concluded that Plaintiff's "severe symptoms only manifest[] during periods of medication noncompliance." (Tr. 19)

The Eighth Circuit has recognized that "a mentally ill claimant's noncompliance can be, and ordinarily is, the result of the mental impairment, and thus it is not deemed willful or unjustifiable." Watkins v. Astrue, 414 Fed. Appx. 894, 896 (8th Cir. 2011) (citing Pates-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009)). Under the circumstances of this case, Plaintiff's medical noncompliance may be a symptom of her impairments rather than evidence that her symptoms are less disabling than she alleged.

19

Additionally, the ALJ found that, after two psychiatric hospitalizations in February 2018, Plaintiff "continued in medication management and therapy" and reported "some improvement with medication."  (Tr. 19)  The ALJ stated that Plaintiff's "mental health notes show progress when medicated and mental status examinations within normal limits."  (Id.)

Plaintiff's medical records support the ALJ's finding that her mental condition improved after March 2018 when she established psychiatric care at Clarity Healthcare.  However, it is not clear whether the ALJ considered the evidence that, during this period of relative stability, Plaintiff spent several months in residential treatment and regularly attended two hours of group therapy four days per week.  "[D]oing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) ("'doing well' as a chronic schizophrenic is not inconsistent with a finding of disability").

Moreover, the Court finds that the ALJ overstated Plaintiff's improvement, finding that "her most recent treatment notes … support some continued symptoms, but a normal mental status examination, and do not reflect the severely debilitating symptoms the claimant alleged at the hearing."  (Tr. 19)  A review of the record reveals that, at Plaintiff's annual psychiatric evaluation in May 2019, she reported some improvement and denied hearing voices or having hallucinations "right this second," but added, "I do see shadows a lot and I hear like morning radio.  And nothing's on."  (Tr. 1504)  The social worker observed that Plaintiff continued to struggle with physical and mental health problems and concluded "[a] critical intervention plan is indicated at this time."  (Tr. 1513)

The following week, Plaintiff's primary care provider opined that she required four-hour daycare services four days per week.  (Tr. 1402)   At Plaintiff's last recorded psychiatric

20

appointment in August 2019, the psychiatrist noted that Plaintiff was "not doing well," "has gone 8 days with[out] her meds for some reason," and "[w]as getting paranoid…. Actually thought that the radio station was playing songs about her."  (Tr. 1474)  Thus, Plaintiff's medical records do not support the ALJ's suggestion that treatment had resolved Plaintiff's mental health symptoms.

Based on the above, the Court finds that many aspects of the ALJ's credibility analysis are not supported by the record.  Furthermore, the evidence as a whole does not weigh so heavily against Plaintiff's subjective complaints that the ALJ would necessarily have disbelieved Plaintiff absent the ALJ's erroneous inferences from the record.  See Ford, 518 F.3d at 982–83 (remanding for further consideration where the ALJ gave some good reasons for discounting the plaintiff's credibility but also gave reasons not supported by the record, relied on inconsistencies that were not actually inconsistencies, and relied on the plaintiff's account of limited daily activities that were not actually inconsistent with her complaints of pain); Brosnahan v. Barnhart, 336 F.3d 671, 677–78 (8th Cir. 2003) (remanding where the ALJ gave several reasons for discounting the plaintiff's credibility that were not supported by the record).

Because the Court finds reversible error in the ALJ's assessment of the medical opinion evidence and Plaintiff's subjective complaints, the Court reverses and remands the case to the Commissioner for further proceedings.  Upon reconsideration of appropriate evidence, the ALJ may well determine that Plaintiff is not disabled.  The Court acknowledges that upon remand, the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undertaking the required analysis, but the determination is one the Commissioner must make in the first instance. See Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000) (when a claimant appeals from the Commissioner's denial of benefits and the denial is improper, out of an abundant deference to the ALJ, the Court remands the case for further administrative proceedings);

Adams v. Kijakazi, 4:21-CV-953 NAB, 2022 WL 5074984, at *6 (E.D. Mo. Sep. 30, 2022) (ALJ duty to make disability determination).

      Accordingly,

      **IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

      An order of remand shall accompany this memorandum and order.


_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of January, 2023